## VICTOR TALKING MACH. CO. v. BRUNSWICK–BALKE–COLLENDER CO.
### SAME v. GENERAL PHONOGRAPH CORPORATION et al.

(Circuit Court of Appeals, Sixth Circuit. February 6, 1923.)

#### Nos. 3747, 3748.

Patents ⬳328—814,786, claims 2 and 42, and 814,848, claims 7 and 11, for talking machine improvements, valid, but not infringed.

Claims 2 and 42 of the Johnson patent, No. 814,786, and claims 7 and 11 of the Johnson patent, No. 814,848, for improvements in talking machines, *held* valid and not anticipated, but not infringed, when considered with reference to the only meritorious thought involved, that of providing support for the type of horn formerly used without interfering with the machine's reproducing qualities.

Appeals from the District Court of the United States for the Western District of Michigan; Clarence W. Sessions, Judge.

Suits by the Victor Talking Machine Company against the Brunswick-Balke-Collender Company and against the General Phonograph

Corporation and another. From a decree in each suit dismissing the bill, plaintiff appeals. Affirmed.

Wm. H. Kenyon, of New York City (John D. Myers, of Camden, N. J., and George T. Bean and Theodore S. Kenyon, both of New York City, on the brief), for appellant.

Frederick P. Fish, of Boston, Mass. (William O. Belt, of Chicago, Ill., and John L. Lotsch and J. L. Stackpole, both of New York City, on the brief), for appellees.

Before DENISON and DONAHUE, Circuit Judges, and PECK, District Judge.

PER CURIAM. These cases were brought for infringement of the same Johnson patents—814,786 and 814,848—upon improvements in talking machines, considered by this court in Victor Co. v. Cheney Co., 278 Fed. 445. Relying upon our conclusions in that case, the court below held that there was no infringement in these cases and dismissed the bills. The Victor Company appeals.

The defendant Brunswick Company made and sold a complete talking machine of the general type of the Cheney, as illustrated in 278 Fed. 447. Reference to page 446 of that volume shows the patents in suit. The defendant General Company made and sold two types of so-called tone arms, being that part of the sound reproducing and conveying means situated above the disc and table in the cabinet type of machine. These parts were sold to three different manufacturers, who united them with the cabinets containing the remainder of the sound reproducing devices and sold the complete combination. Manifestly, if the defendant General Company has infringed, it has been only in a contributory way, and questions—perhaps troublesome—exist as to this defendant's participation in the complete manufacture to a degree sufficient to make out contributory infringement; but we prefer to pass these questions by and dispose of the case as if the General Company were fully responsible for each of these three ultimate forms.

Reference must be had to the former opinion for the general situation. We now state merely our conclusions, with only enough of the reasons therefor to indicate the grounds upon which we are content to let them rest.

These records disclose nothing substantial as to the validity of the patents beyond what was considered in the Cheney Case, save as to the defense of prior use by Tisdell. We are not satisfied that it is established sufficiently to meet the strict rules of proof required in such cases. The early structure which is produced was clearly not built until after the date to which Johnson is entitled, and the witnesses have only their recollection to support their conclusions that this construction is essentially like the earlier ones they had seen several years before. Then, too, the point now involved—the shape of the tone arm—was not then noticed by any one as of any importance, and the interest and attention of all were centered upon another feature of the machine. It is probable enough that if the exhibit shown to these witnesses and identified by them with the earlier structures had con-

tained a straight tone arm instead of a tapered one, they would have identified it just as completely and in just the same good faith.

Nor do we think that the earlier dated English patents of Johnson and his associates are to be treated as of date anticipatory of the Johnson invention of the two patents in suit. When the question is whether some one else invented before Johnson did, it is not decisive— if important—to know what Johnson himself did before he perfected this invention. No sufficient prior publication of these patents is shown.

We find ourselves, as did the somewhat differently constituted court in the former case, in grave doubt whether what Johnson did involved any invention, when it is considered alone from the point of view that he substituted a tapered tube for a straight one in an existing structure, but not sufficiently satisfied that the patents lack invention when considered as well from another view.

The art knew no reproducing horn excepting that which was completely carried above the disc. It was then thought that the entire horn ought to be movable; it was certain that part of it must move as the needle progressed across the disc. If the whole weight of the horn rested directly or indirectly upon the needle, it brought serious interference with good results. The problem was to support the horn, or the most of it, up and away from the needle and relieve this pressure.

Before Johnson, others met this problem by finding a way to support the horn, but they substituted a straight tube for the initial tapering part of existing horns; and this substituting probably interfered with that reproducing perfection which already existed with a continuously tapered horn starting from the sound box. Johnson's thought— perhaps his inspiration—was that he could take the existing continuously tapered horn, doubled back on itself (Weaver), maintain its reproducing qualities unimpaired, and at the same time support the bulk of its weight above the disc so as to get rid of friction and drag on the needle and disc, and that he could do this by severing the horn at the bend, supporting and carrying both parts of it at that point, leaving it necessary for the smaller part only to move across the disc. All the time the weight of the horn, tending to retard the needle action, was the whole problem; after he solved it Johnson had no better reproducing horn than the old one; but he had largely lifted it off the disc and yet escaped the harm which his predecessors had found incidental to getting the same lift. We think this the true view, and the broadest permissible view, of Johnson's invention; of course, it emphasizes the elements of weight and support and minimizes the mere tapering shape of the small part of the horn, in which shape he had made no change whatever.

Before any of the defendants in these later cases began to manufacture, the whole problem which Johnson met and solved had disappeared from the art. The horn which had tended by its weight to impede the needle was no longer used. Talking machines had come to be almost exclusively of the cabinet type, in which the cabinet or box underneath the record and needle furnished space for containing and supporting the various forms and shapes of tubes or boxes or chambers which per-

mitted the sound waves to expand and caused the sound to amplify. Nothing remained above the disc except the sound box and the tube for conveying the sound waves down into the cabinet. These amplifying means within the cabinet were supported and carried, not in any essential degree by the particular device that supports the outer end of the tone arm, but by the cabinet and frame itself through solid attachment to the bottom and sides thereof. When the tone arms and the parts within the cabinet are considered in a combination way, they bear more or less resemblance to the complete horn of Johnson turned upside down. This resemblance was perhaps closest in the Wanamaker Case (D. C.) 275 Fed. 448; some points of difference are emphasized in the greatest degree in the Cheney Case; the present cases run between these two extremes. The claim in suit would not be fairly escaped by merely turning the Johnson horn upside down; but when this is accompanied by a wholly different character of support and by substantial changes in the shape and functions of the unitary progressive air chamber, which together make the name "horn" of doubtful applicability to the whole structure, there must be great doubt of infringement—even as to claims which without any real distortion of their language may be literally read upon the structures. Upon the whole case we conclude—and though the questions involved are not free from difficulty, we are better content with this conclusion than we would be with the other—that Johnson's contribution to the art, in view of its late development into the forms now used, was not a great one and does not strongly appeal to give him that measure of monopoly of the whole industry to which his theories would lead; and that therefore his claims should be rather strictly construed, with a tendency to limit them to the type of structure which was the only one known in his day, and the peculiar problems of which caused his invention to be necessary and useful. It is perhaps another way of expressing the same ultimate thought, to say that if the present cabinet type of structure, including all the parts below the disc, had been old in Johnson's day, and he had merely substituted a tapered tube for a straight one in conveying the sound out to its downward turn, it would have been difficult to find any invention in his act.

Infringement is alleged of claims 2 and 42 of patent No. 814,786, and claims 7 and 11 of patent No. 814,848. As to claim 42 it is not necessary to go further than we did in the Cheney Case, in the way of reading the claim more narrowly than its mere words might possibly justify. No one of the devices here involved has the characteristic means for supporting and coupling both parts of the horn by which means we thought this claim was dominated.

As to claim 2[1] the call for supporting means is somewhat broader; it is not limited by the thought that the same means which supports must

[1] In a talking machine, an amplifying horn proper, a record support, a tapering sound tube movable independent of the amplifying horn proper and supported to move in a given plane parallel with said record support, a sound box mounted upon and communicating with the small end of said tube and movable independently thereof toward and away from the record-support, said horn and tube communicating, and supporting means at the communicating portion of said horn and tube.

also couple; but when we consider the part which the function of horn support played in the invention, we think the supporting means called for by this claim are at least those which support the so-called horn proper, if not those which support both parts of the horn. These supporting means must be at the communicating portion of the horn and tube. In no one of the defendants' structures is this to be found. If the parts contained in the cabinets constitute the horn of claim 2, they are supported by the cabinet in various ways, and not, in any essential degree, at the end of the tube. Whatever support is there given is only incidental, and a bracing against vibration rather than a carrying of the weight burden.

Claims 7 and 11 of the other patent[2] present the question whether defendants' structures have the amplifying horn comprising "a tapering curved tube," or "a continuously tapering tube." As to the tone arm, no one of the defendants' forms has the continuous tapering in as full a degree as the Cheney did. In the Brunswick there is a slight taper for the first one-third of the distance from the sound box. The remainder is cylindrical, save only for the enlargement to the extent caused by a telescopic joint in the thin metal; and this joint is not a pretense for making an enlargement but is functionally useful. The General Company's Heineman tone arm is cylindrical from the sound box until it turns downward, and, save for a similar useful telescopic joint, it is fair to say that of its entire length about one-half is tapering and half is not. In the General Company's Meisselbach tone arm, the situation is about the same. Disregarding the part which closely corresponds to Johnson's sound box, the so-called tone arm is half cylindrical and half tapering. Going below the cabinet shelf or table which carries the disc, we find in the Brunswick a straight cylindrical passage which extends at the same diameter from a point well up into the tone arm down to below the middle of the cabinet, and without expansion save a slight enlargement where the metal tube enters the wood. From the sound box to the point where the final continuous enlargement begins, about three-quarters of the distance is cylindrical and one-quarter tapering. In the Elite, using the General Company's tone arm, it is also true that a substantial portion of the horn is cylindrical and not tapering, although if only the matter of the tapering horn were to be considered, it might be difficult to distinguish this from the one involved in the Wanamaker Case. Neither of the two other horn structures found in the defendants' cabinets is any closer than the Elite.

Turning, then, our attention to the other limiting elements found in the claims: Claim 7 refers to the entire horn, having a joint between the larger and the smaller parts of the horn, being supported at the joint. This requires, in view of the nature of the invention, that

[2] 7. An amplifying horn, comprising a continuously tapering tube having a joint to allow a movement of one end of said horn in relation to the other, said horn being supported at said joint.

11. An amplifying horn, comprising a tapering curved tube, said tube being pivoted on a substantially vertical axis to allow a horizontal movement of the smaller end of said tube, the curved portion of said horn connecting sections thereof lying in substantially parallel planes, said axis passing through or adjacent said curved portion.

the larger part should be carried and supported by means at the joint; and we have seen that this does not occur in any of the defendants' forms. Claim 11 requires that the "tapering curved tube" shall be pivoted on a vertical axis. It is the whole tube which is pivoted and not any part of it. True, the pivotal function recited in this claim pertains only to the smaller part of the tube, but the requirement that the whole tube should be pivoted is express. and in no one of defendants' forms is the major part of the horn pivoted at all. Again the claim requires that the upper and lower parallel parts of the horn should be connected by a "curved portion" through which the vertical axis passes. It is not easy to consider the long cylindrical intermediate portion of the sound passage in the Brunswick as merely a "curved portion," connecting the upper and lower parts. If this conception is easier in a form like the Elite, it still remains true that the vertical axial pivot does not pass through but only into the curved portion, thus emphasizing that it performs no axial function for the horn as a whole.

Our conclusion is that, giving to the claims in suit the construction required when the invention is considered with reference to the only meritorious thought which it embodied, no one of the claims in suit is infringed by any one of the defendants' structures.

The decrees of the District Court are affirmed.